Slip Op. 17-135

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **MID CONTINENT STEEL & WIRE, INC. ET AL.,**<br><br>    **Plaintiff and Consolidated Plaintiffs,**<br><br>v.<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>and<br><br>**PT ENTERPRISE INC. ET AL.,**<br><br>    **Defendant-Intervenors and Consolidated Defendant-Intervenor.** | Before: **Claire R. Kelly, Judge**<br><br>Consol. Court No. 15-00213<br>PUBLIC VERSION |

## OPINION

[Sustaining the U.S. Department of Commerce's remand determination concerning the antidumping duty investigation covering certain steel nails from Taiwan.]

Dated: October 4, 2017

Adam Henry Gordon and Ping Gong, The Bristol Group PLLC, of Washington, DC, for plaintiff and consolidated defendant-intervenor Mid Continent Steel & Wire, Inc.

Ned Herman Marshak and Andrew Thomas Schutz, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, and Washington, DC, for consolidated plaintiffs and defendant-intervenors PT Enterprise Inc., Pro-Team Coil Nail Enterprise Inc., Unicatch Industrial Co., Ltd., WTA International Co., Ltd., Zon Mon Co., Ltd., Hor Liang Industrial Corporation, President Industrial Inc., and Liang Chyuan Industrial Co., Ltd.

**PUBLIC VERSION**

Mikki Cottet, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Zachary Scott Simmons, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Kelly, Judge:  Before the court for review is the U.S. Department of Commerce's ("Commerce" or "Department") remand determination in the antidumping duty ("ADD") investigation of certain steel nails from Taiwan, filed pursuant to the court's order in Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, 219 F. Supp. 3d 1326 (2017). See Final Results of Redetermination Pursuant to Court Remand, June 21, 2017, ECF No. 95 ("Remand Results"); see also Mid Continent Steel & Wire, Inc. v. United States, 41 CIT __, __, 219 F. Supp. 3d 1326, 1351 (2017) ("Mid Continent").

The court remanded for Commerce to explain its cost allocation methodology and calculation of the general and administrative ("G&A") expense ratio for Pro-Team Coil Nail Enterprise Inc. ("Pro-Team"), an affiliate of mandatory respondent PT Enterprise, Inc. ("PT").  Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1351; see generally Certain Steel Nails From Taiwan, 80 Fed. Reg. 28,959 (Dep't Commerce May 20, 2015) (final determination of sales at less than fair value) ("Final Results") and accompanying Issues and Decision Mem. for the Affirm. Final Determination in the Less Than Fair Value Investigation of Certain Nails from Taiwan, A-583-854, (May 13, 2015), ECF No. 17 ("Final Decision Memo").  For the reasons that follow, the Remand Results adequately address the concerns raised in the court's prior decision and Commerce's revised

Case 1:15-cv-00220-CRK   Document 27   Filed 10/11/17   Page 3 of 15

Consol. Court No. 15-00213                                                                              Page 3
**PUBLIC VERSION**

determination is supported by substantial evidence. Therefore, the Remand Results are sustained.

# BACKGROUND

The court assumes familiarity with the facts of this case as set out in full in the previous opinion ordering remand to Commerce, see Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1330–32, and here summarizes the facts relevant to its review of the Remand Results.

On March 23, 2017, the court sustained in part and remanded in part Commerce's final determination in this ADD investigation.[1] See Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1351. The court determined that "Commerce fail[ed] to state or explain how its cost allocation methodology could result in allocating certain steam-related costs to G&A expenses, when [Commerce] claims to have allocated all those costs to COGS." Id., 41 CIT at __, 219 F. Supp. 3d at 1345. Given the apparent discrepancy between Commerce's description of its cost allocation methodology and its actual methodology for calculating the G&A expense ratio in this case, the court found Commerce's calculation of selling, general, and administrative expenses to be unsupported by substantial

---

[1] Of the challenged issues from the final determination, the court sustained Commerce's determinations: (1) that Pro-Team is unaffiliated with the [[   ]] tollers in question, see Mid Continent, 41 CIT __, __, 219 F. Supp. 3d 1326, 1332–35 (2017); (2) to use the Cohen's d test within the differential pricing analysis to determine the existence of a pattern of significant price differences, see id., 41 CIT at __, 219 F. Supp. 3d at 1337–40; (3) to use a simple average to calculate the pooled standard deviation in the Cohen's d test of the differential pricing analysis, see id., 41 CIT at __, 219 F. Supp. 3d at 1340–43; (4) to not offset dumped sales with non-dumped sales in calculating the respondent's antidumping duty margin using the average-to-transaction methodology, see id., 41 CIT at __, 219 F. Supp. 3d at 1343–44; and (5) to disregard transfer prices paid by Pro-Team to certain affiliated tollers in its calculation of normal value. See id., 41 CIT at __, 219 F. Supp. 3d at 1349–51.

evidence.  See id., 41 CIT at __, 219 F. Supp. 3d at 1344–48.  The court remanded for Commerce to "explain how it allocates different costs to the respective components [of the] G&A expense ratio and explain why its determination is supported by the record evidence or reconsider its determination."  Id., 41 CIT at __, 219 F. Supp. 3d at 1345.  Pending such clarification, the court deferred deciding whether Commerce's decision to allow income from a subsidy to offset cost of goods sold ("COGS"), i.e., the denominator of the G&A expense ratio, was reasonable and supported by the record.  Id., 41 CIT at __, 219 F. Supp. 3d at 1348.

Commerce filed the Remand Results on June 21, 2017.  On remand, Commerce clarified that it treats costs and expenses related to Pro-Team's steam line of business consistently with how they are reported in Pro-Team's books and records (i.e., its audited financial statements).  See Remand Results 8–11, 14–15.  Commerce explained that it assigns costs and expenses on a company-wide, and not product-specific, basis.  Id. at 6–7, 14–15.  Therefore, a given company-wide expense is assigned to either the numerator or denominator of the G&A expense ratio based on whether it is directly related to the manufacture of products during the period of investigation or review, and not based on whether the expense is itemized as either steam-related or nail-related.  See id. at 6–7, 14–15.  Commerce explained that it determines whether an expense directly relates to manufacturing based upon how Pro-Team classifies such costs in its books and records.  See id. at 6–7, 10–11 (citing PT Enterprise Supp. Section D Resp. at Ex. SD-21, CD 79–

Consol. Court No. 15-00213                                                                                              Page 5
**PUBLIC VERSION**

84, bar codes 3237002-01–06 (Oct. 21, 2014) ("PT Supp. D Resp.")),[2] 14–15. As a result, Commerce clarifies that expenses allocated to G&A in Pro-Team's financial statements were not allocated to COGS in the G&A expense ratio calculation. See id. at 11, 14.

On remand Commerce reconsidered its determination to offset COGS expenses with subsidy income attributable to Pro-Team's steam business. Remand Results 15. Instead, on remand Commerce treated the subsidy income relating to Pro-Team's steam business as an offset to G&A expenses (i.e., the numerator of the G&A expense ratio). Id. Accordingly, Commerce recalculated the G&A expense ratio to reduce the ratio's numerator, resulting in a reduction of the G&A ratio and, consequently, a reduction of PT's selling, general, and administrative expenses. See id. at 16. This change in methodology resulted in a revised final margin of 2.16 percent for PT. Id. at 23–24. Commerce explained that, "[b]ecause the all others rate was based on PT's final margin," this change in methodology resulted in a revised all others rate of 2.16 percent. Id. at 24.

## JURISDICTION AND STANDARD OF REVIEW

The Court continues to have jurisdiction pursuant to Section 516a(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[3] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final

---

[2] On October 16, 2015, Defendant submitted indices to the public and confidential administrative records, which identify the documents that comprise the records to Commerce's final determination. These indices are located on the docket at ECF No. 17. All further references to documents from the administrative records of the final determination are identified by the numbers assigned by Commerce in these indices.

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

determination in an investigation of an ADD order. See 19 U.S.C. § 1516a(a)(2)(B)(i); 28 U.S.C. § 1581(c) (2012). "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I. Expense Allocation Methodology and Calculation

The court held that Commerce's calculation of the G&A expense ratio for PT was not supported by substantial evidence because Commerce failed to explain how it allocated specific costs associated with the steam business of PT's affiliate, Pro-Team, to the respective components of the G&A expense ratio.[4] See Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1345–48. Specifically, the court observed that "Commerce fails to state or explain how its cost allocation methodology could result in allocating certain steam-related expenses to G&A expenses, when it claims to have allocated all those costs to COGS." Id. Therefore, the court remanded Commerce's G&A expense ratio

---

[4] In Mid Continent, the court noted that Commerce stated that "'[t]he costs associated with the steam line of business were properly included in the denominator of the G&A expense ratio calculation (i.e., COGS).'" Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1347 (quoting Final Decision Memo at 55). Yet, the court noted that Commerce did not allocate all expenses attributable to steam to the COGS denominator, but rather allocated research and development and depreciation costs to G&A expenses and allocated other expenses attributable to steam to COGS. Id., 41 CIT at __, 219 F. Supp. 3d at 1347.

Consol. Court No. 15-00213                                                                                      Page 7
**PUBLIC VERSION**

calculation for further explanation of how the Department allocates costs to the respective components of a G&A expense ratio calculation and for further explanation as to why its cost allocation is supported by the record here or to reconsider its determination.  Id., 41 CIT at __, 219 F. Supp. 3d at 1351.  For the reasons that follow, on remand Commerce has adequately explained its expense allocation methodology and its determination on remand is supported by substantial evidence.

Commerce calculates a respondent's dumping margin by determining "the amount by which the normal value exceeds the export price . . . of the subject merchandise."  19 U.S.C. § 1677(35)(A).  Normal value typically is calculated based on "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i).  However, when Commerce determines that the respondent does not have viable home or third-country market sales, the statute directs that Commerce may use a constructed value ("CV") to calculate a normal value for respondent.[5]  See 19

---

[5] The statute provides that CV of imported merchandise is equal to the sum of: (1) the cost of materials of fabrication or other processing of any kind in producing the merchandise; (2) some representation of the amounts incurred and realized for selling, general, and administrative expenses and for profits in connection with the production and sale of merchandise for consumption in the foreign country; and (3) packing and other expenses incidental to placing the subject merchandise in condition packed and ready for shipment to the United States.  19 U.S.C. §§ 1677b(e)(1)–(3).  If actual data are not available for selling, general, and administrative expenses, then Commerce may calculate selling, general and administrative expenses based on: (1) the actual amounts incurred and realized by the specific exporter or producer for selling, general, and administrative expenses in connection with the production and sale, for consumption in the foreign country, of merchandise of the same general category of products as the subject merchandise; (2) the weighted-average of the actual amounts actually incurred and realized by other exporters or producers subject to the investigation; or (3) based on any other reasonable method.  19 U.S.C. §§ 1677b(e)(2)(B)(i)–(iii).

U.S.C. §§ 1677b(a)(1)(B)–(C), (a)(4); see also Decision Mem. for the Prelim. Determination in the [ADD] Investigation of Certain Steel Nails from Taiwan at 13, PD 225, bar code 3247845-01 (Dec. 17, 2014) (stating that Commerce used CV as the basis for normal value because PT did not have a viable comparison market).

In calculating CV, Commerce must include selling, general, and administrative expenses. See 19 U.S.C. §§ 1677b(e)(3)(1)–(3). The statute does not define selling, general, and administrative expenses. However, "G&A expenses are generally understood to mean expenses which relate to the activities of the company as a whole rather than to the production process." Torrington Co. v. United States, 25 CIT 395, 431, 146 F. Supp. 2d 845, 885 (2001) (internal quotations omitted). The court affords Commerce significant deference in developing a methodology for determining this component of CV because it is a determination "involv[ing] complex economic and accounting decisions of a technical nature." Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996). However, Commerce "must cogently explain why it has exercised its discretion in a given manner." Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983).

To compute the per-unit amount of selling, general, and administrative expenses, Commerce multiplies a G&A expense ratio by the total costs of manufacture for each product assigned a control number by Commerce. See, e.g., Commerce Request for Information: [ADD] Investigation, PT Enterprise Inc., Taiwan, Certain Steel Nails at D-14, PD 63, bar code 3217476-02 (July 24, 2014). According to Commerce's stated practice, the numerator for the G&A expense ratio is the respondent's expenses attributable to

Consol. Court No. 15-00213                                                                       Page 9
**PUBLIC VERSION**

general operations of the company and the denominator is the respondent's company-wide COGS.  Remand Results 1 n.2, 6–7.  Thus, the G&A expense ratio, expressed as an equation is as follows:

$$G\&A\ Expense\ Ratio = \frac{G\&A\ Expenses\ (company\ wide)}{COGS\ (company\ wide)}$$

See id. at 6–7.

Here, Commerce clarifies that it allocated all company-wide costs, whether attributable to production of steam or nails, to the G&A (i.e., numerator) portion of the G&A expense ratio where those expenses are not directly attributable to the manufacture of products.  See Remand Results 6–7, 11, 14.  Likewise, Commerce clarifies that it classified those company-wide expenses that are directly related to the manufacture of products, whether attributable to the production of steam or nails, to COGS (i.e., the denominator portion of the expense ratio).  See id. at 7, 11, 14.  Thus, the costs were not allocated based on whether those costs are attributable to subject or non-subject merchandise, see id. at 11, 14, as the court understood Commerce's explanation of its practice in its final determination.  Citing its practice of generally relying upon the classifications of expenses as recorded on a company's audited financial statements so long as those financial statements are prepared in accordance with generally accepted accounting principles ("GAAP") in the respondent's home country, Commerce clarified that it allocates non-production costs to G&A and production costs to COGS based upon how Pro-Team treated those expenses in its financial statements.  Id. at 10, 14.  Here, Commerce explains that it allocated expenses attributable to steam production to G&A

and COGS, respectively, by looking at how PT allocated such costs in its audited financial statements. Id. at 11, citing PT Enterprise Section A Response: [ADD] Investigation of Certain Steel Nails from Taiwan at Ex. A-12, at Pro Team Coil Nail Enterprise Inc. Financial Statements Independent Auditors' Report Dec. 31, 2013 and 2012, at 3, bar code 3224544-04 (Aug. 28, 2014) ("PT's Section A Resp. Audited Income Statement 2013 and 2012")), 14. Specifically, Commerce allocated non-manufacturing-related expenses, like research and development and depreciation, regardless of whether those costs relate to manufacture of subject merchandise or non-subject merchandise, to G&A. See id. at 10–11, 14–15. Commerce allocated manufacturing-related expenses, including expenses attributable to steam production, to COGS. See id. at 10–11, 14–15. Furthermore, Commerce explains that including expenses attributable to steam is consistent with Commerce's practice of calculating the G&A expense ratio on a company-wide basis, and not "based on a consolidated, divisional, or product-specific basis, because the G&A expenses relate to the general operations of the producing company as a whole, are associated with the period of time, and are not related to specific products." Id. at 9, 14–15.

No party continues to challenge on remand Commerce's methodology used to calculate the G&A expense ratio or to assert that Commerce's methodology reflects an unreasonable and unlawful application of the statute and regulations. See [PT and Pro-Team] Remand Comments, July 21, 2017, ECF No. 99; Comments of Pl./Consol. Def.-Intervenor Mid Continent Steel & Wire, Inc. on Final Results of Redetermination Pursuant to Court Remand 1, July 21, 2017, ECF No. 98 ("Mid Continent Comments"). Commerce

Case 1:15-cv-00220-CRK   Document 27   Filed 10/11/17   Page 11 of 15

Consol. Court No. 15-00213                                                                    Page 11
**PUBLIC VERSION**

has provided further explanation of its expense allocation methodology, and Commerce's Remand Results therefore comply with the court's order. See Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1351. Accordingly, the Remand Results are sustained with respect to Commerce's allocation of costs in the calculation of Pro-Team's G&A expense ratio.

## II. Allocation of Steam-Related Income Offset

The court deferred consideration of Pro-Team's challenge to Commerce's allocation of income attributable to steam production until Commerce had clarified the apparent inconsistencies in Commerce's expense allocation methodology. See Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1348. Mid Continent claims that Commerce lacks substantial evidence to apply the subsidy income as an offset to COGS (i.e., the denominator of the G&A expense ratio) because this determination is inconsistent with Pro-Team's explanation that the purpose of the subsidy was to reduce the production costs related to steam production products. Mid Continent Comments 2 (internal quotations omitted). For the reasons that follow, Commerce's allocation of subsidy income attributable to production of steam is supported by substantial evidence.

As discussed, Commerce is required to include selling, general, and administrative expenses in its CV calculation. See 19 U.S.C. §§ 1677b(e)(3)(1)–(3). However, the statute does not define selling, general, and administrative expenses. "G&A expenses are generally understood to mean expenses which relate to the activities of the company as a whole rather than to the production process." Torrington Co., 25 CIT at 431, 146 F. Supp. 2d at 885 (internal quotations omitted); see also Remand Results 6–7. Neither the

Consol. Court No. 15-00213                                                                                                  Page 12
**PUBLIC VERSION**

statute nor Commerce's regulation further define how expenses and income offsets are to be allocated in calculating the G&A expense ratio within Commerce's CV calculation.

On remand, Commerce reconsidered its prior decision and included the subsidy income attributable to Pro-Team's separate steam line of business in G&A expenses (i.e., the numerator of the G&A expense ratio) instead of assigning the subsidy as an offset to the operating expenses (i.e., non-manufacturing related expenses) for steam production products to COGS (i.e., the denominator of the G&A expense ratio), as it had in its final determination.[6] Remand Results 15–16. Commerce explains that it revised its treatment of the subsidy income because Pro-Team's financial statements "indicate that the subsidy did not relate to operating expenses, but, rather, to general operations." Id. at 16. Commerce supports its determination by citing Pro-Team's audited financial statements and the revised cost allocation worksheet submitted by Pro-Team, which Commerce explains records the subsidy as part of "non-operating other income." Id. at 15. Commerce explains that both of these documents record the subsidy as part of Pro-Team's non-operating other income and show that Pro-Team did not apply the subsidy as an offset to COGS of steam production products nor its operating costs. Id. (citing PT Supp. D Resp. at Exs. SD-21, SD-24; PT's Section A Resp. Audited Income Statement 2013 and 2012). Commerce further explains its determination by referencing its normal

---

[6] The court recognizes that Commerce, on remand, reconsidered how to treat the allocation of income attributable to the energy subsidy. See Remand Results 15; see generally Final Results. The court did not remand this issue; rather, the court deferred it pending clarification by Commerce of its cost allocation methodology. See Mid Continent, 41 CIT at __, 219 F. Supp. 3d at 1348. Although the issue was not remanded for reconsideration, the court will nevertheless review Commerce's redetermination on this issue. All parties had the opportunity to comment and did not object to Commerce proceeding in this manner. See Remand Results 16–23.

Consol. Court No. 15-00213                                                                                           Page 13
**PUBLIC VERSION**

practice of relying on the books and records of the exporter or producer, "if such records are kept in accordance with the GAAP of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise." Id. at 22.

Mid Continent Steel & Wire, Inc. ("Mid Continent") claims that the record does not support Commerce's decision to reallocate steam-related subsidy income to offset G&A expenses (i.e., the numerator of the G&A expense ratio) because nothing on the record supports a change from Commerce's initial determination to offset COGS (i.e., the denominator of the G&A expense ratio) by income attributable to the steam-related subsidy. Mid Continent Comments 2–3. However, Commerce's determination to reallocate the income attributable to the steam subsidy is based on Pro-Team's audited financial statements and revised financial documents. See Remand Results 15–16 (citing PT Supp. D Resp. at Exs. SD-21, SD-24; PT's Section A Resp. Audited Income Statement 2013 and 2012). Commerce references Pro-Team's treatment of the income attributable to the subsidy as part of "non-operating other income" in both its audited financial statements and the revised cost allocation worksheet, and Commerce notes that Pro-Team did not treat this income as an offset to COGS of steam production products or to the company's operating costs. Id. at 15, 23. Mid Continent concedes that Pro-Team's books and records did not indicate that the subsidy was applied as an offset to COGS. See Mid Continent Comments 3.

Mid Continent further argues that Commerce should treat the subsidy consistent with Pro-Team's explanation that the subsidy's purpose was to reduce the production costs related to steam production products, and consistent with Commerce's treatment in

Consol. Court No. 15-00213                                                                         Page 14
**PUBLIC VERSION**

the final determination.  Mid Continent Comments 3.  Commerce notes that its initial determination to allocate this income as an offset to COGS was based upon Pro-Team's explanation "that the purpose of the subsidy was to reduce the production costs related to steam production products."  Remand Results 15.  Commerce indicates that the underlying support for Pro-Team's explanation was cost allocation worksheets created for the purposes of the investigation.  Id.; see PT Supp. D Resp. at 11–12, Exs. SD-21, SD-24.  Commerce explains that, although these cost allocation worksheets do "identif[y] certain costs and expenses related to steam production products separately, the company's audited financial statements . . . ma[k]e no such distinction."  Remand Results 19.  In fact, they are "reported in [Pro-Team's] financial statements as period costs along with all other G&A expenses, indicating that they are general in nature and not product-specific."  Id. at 22.  Commerce's practice is to rely upon the books and records of an exporter if such records are in accordance with GAAP and reasonably reflect the costs of production, pursuant to the directive of 19 U.S.C. § 1677b(f)(1)(A) for constructing value.[7]  See id.; 19 U.S.C. § 1677b(f)(1)(A).  Mid Continent offers no evidence that Pro-Team's financial statements were inconsistent with Taiwanese GAAP or do not accurately reflect costs.  Commerce is entitled to significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature."  Fujitsu, 88 F.3d at

---

[7] The Remand Results provide ample support that such methodology has been consistently applied in prior determinations.  See Remand Results 7 n.27.  Furthermore, this court recognized Commerce's practice of calculating the G&A expense ratio by using a company's audited financial statements in Ass'n of Am. Sch. Paper Suppliers v. United States, 33 CIT 1742, 1745–47,1751–52 (2009) (discussing the methodology to decide whether it was proper to depart from its use).

Consol. Court No. 15-00213                                                                                          Page 15
**PUBLIC VERSION**

1039.  Mid Continent merely urges a different result, but the court declines to disturb Commerce's weighing of the evidence on a determination that is uniquely within the Department's expertise.  Commerce's treatment of the subsidy income in its Remand Results is supported by substantial evidence.

## CONCLUSION

Therefore, for the reasons discussed, the court sustains the Remand Results. Judgment will enter accordingly.


                                                                          /s/ Claire R. Kelly
                                                                         Claire R. Kelly, Judge


Dated: October 4, 2017
       New York, New York